# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| IN RE: ) | |
| ) | Case No. 19-35308 |
| LANNY R. GIBRICK, ) | |
| ) | Chapter 13 |
| Debtor. ) | |
| ) | Hon. Judge A. Benjamin Goldgar |
| ) | |

## MOTION TO LIFT AUTOMATIC STAY OR DISMISS
## CHAPTER 13 BANKRUPTCY PETITION

NOW COMES Creditor ROBERT GOLDEN ("Golden"), by and through his attorney, The Law Offices of Brendan R. Appel, LLC, and for his Motion to Lift the Automatic Stay pursuant to 11 U.S.C. § 362(d)(1) or Dismiss Chapter 13 Bankruptcy Petition pursuant to 11 U.S.C. § 1307(c), states as follows:

### Introduction

On December 16, 2014, a Judgment was entered in the Circuit Court of Cook County against the Debtor, Lanny Gibrick ("Gibrick"), for defrauding Golden by taking a deposit for installing window shades but never providing them. In 2015, Gibrick pleaded guilty to criminal charges in Lake County stemming from a very similar fact pattern. After Golden instituted collection proceedings in 2015, Gibrick filed for Chapter 13 bankruptcy protection in case no. 15 B 23651. Gibrick eventually converted that matter to a Chapter 7 proceeding and a discharge order was entered by this court on January 7, 2016, except as to the adversary proceeding that Golden filed in case 16 A 14. On February 16, 2018, as this Court will recall, a default judgment was entered against Gibrick as a sanction that declared the debt to Golden was non-dischargeable. Yet since the entry of this Court's Default Judgment, Gibrick's misconduct has continued through additional perjury, misrepresentations, violation of state court orders, the

1

failure to make one single voluntary payment of his own money, and general defiance. Gibrick's methods to avoid paying on the Judgment, include, but are not limited to, funneling income earned through bank accounts controlled by his son despite being prohibited from transferring any assets under the Citation issued in November 2018. Now, two (2) days before the Circuit Court was ready to rule on a Petition for Rule to Show against Gibrick in which he did not even file a responsive pleading, his 11th hour filing for Chapter 13 bankruptcy protection is clearly in bad faith as Golden's Judgment is non-dischargeable and there is no other major creditor.

## **Standard of Review**

11 U.S.C. § 362(d)(1) provides that "[o]n request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay (1) for cause." 11 U.S.C. § 1307(c) states that in a chapter 13 proceeding, "on request of a party in interest . . . the court may . . . dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for cause."

The burden of proof on a motion to lift or modify an automatic stay is a shifting one. *In Re Brown*, 311 B.R. 409, 412 (E.D. Pa. 2004), citing to *Burger Boys, Inc. v. South Street Seaport Ltd. Partnership*, 183 B.R. 682, 687 (N.D.N.Y.1994). Under Section 362(d)(1), a creditor *is entitled to relief* from the automatic stay if he can make an *initial showing* of sufficient "cause." *Brown*, 311 B.R. at 412. (Emphases added.) "Cause" is an intentionally broad and flexible concept which must be determined on a case-by-case basis. *Id.*, citing to *In re Merchant*, 256 B.R. 572, 576 (Bankr.W.D.Pa. 2000). Once the movant establishes "cause," the burden of proof shifts to the debtor. *Id.*, citing 11 U.S.C. § 362(g)(1), (2).

Good faith depends on the "totality of the circumstances" for Chapter 13 matters. *In re Schaitz*, 913 F.2d 452, 453 (7th Cir. 1990). A bankruptcy filing made in bad faith may be dismissed "for cause" under 11 U.S.C. § 1307(c). *In Re Margaret J. Myers*, 491 F.3d 120, 125 (3rd Cir. 2007), citing to *In re Lilley,* 91 F.3d 491, 496 (3rd Cir. 1996). The good faith inquiry under Section 1307(c) is *a broad inquiry* focusing on the fairness involved in the initiation of Chapter 13 bankruptcy proceedings. *In re Love*, 957 F.2d 1350, 1360 (7th Cir. 1992) (emphasis added). "The focus . . . is often *whether the filing is fundamentally fair to creditors* and, more generally, is the filing fundamentally fair in a manner that complies with the spirit of the Bankruptcy Code's provisions." *Id*. at 1357 (7th Cir. 1992) (emphasis added), see also *Schaitz*, 913 F.2d at 453 ("Is he really trying to pay the creditors to the reasonable limit of his ability or is he trying to thwart them?). "[A] sincere effort at repayment" is a sine qua non of good faith. *In re Caldwell,* 895 F.2d 1123, 1126 (6th Cir. 1990). "Keeping in mind that the focus of the inquiry is fundamental fairness, the following nonexhaustive list exemplifies some of the factors that are relevant when determining if a Chapter 13 petition was filed in good faith: the nature of the debt, including the question of whether the debt would be nondischargeable in a Chapter 7 proceeding; the timing of the petition; how the debt arose; the debtor's motive in filing the petition; how the debtor's actions affected creditors; the debtor's treatment of creditors both before and after the petition was filed; and whether the debtor has been forthcoming with the bankruptcy court and the creditors." See *In re King*, 126 B.R. 777, 781 (Bankr.N.D.Ill.1991) (involved good faith evaluation under 1307(c)).

"The requirement of good faith should not be interpreted to permit 'manipulation of the statute [Chapter 13] by debtors who default on obligations grounded in dishonesty and who subsequently seek refuge in Chapter 13 in order to avoid, at minimal cost, a nondischargeable

3

debt.'" *Love*, 957 F.2d at 1359, citing to *In re Schaitz*, 913 F.2d at 455 (7th Cir. 1990). The suspicious timing of a bankruptcy petition, however, is an appropriate factor for a court to consider in the bad faith analysis. *See In re Tamecki*, 229 F.3d 205, 208 (3d Cir. 2000). Also, "intention to avoid a large single debt" is properly a factor in the bad faith inquiry. *Id*. at 207. "Bankruptcy Courts may reasonably find that bad faith exists 'where the purpose of the bankruptcy filing is to defeat state court litigation without a reorganization purpose.'" *Myers*, 491 F.3d at 125, citing to *In re Dami*, 172 B.R. 6, 10 (Bankr.E.D. Pa. 1994). "[I]t is appropriate for a bankruptcy court to assess the debtor's purpose and, if that purpose is to frustrate another court's jurisdiction, to consider it in the bad faith inquiry." *Myers*, 491 F.3d at 126, citing to *In re Huckfeldt*, 39 F.3d 829, 832 (8th Cir. 1994).

### Facts Common to All Counts

1. Golden filed a complaint against Gibrick in the Circuit Court of Cook County on September 9, 2014 and obtained a Judgment against him. (See Order dated December 16, 2014 and Memoranda of Judgments attached hereto as **Exhibit A**.)

2. Golden was in collection proceedings in when Gibrick filed for Chapter 13 bankruptcy protection on July 10, 2015 in case no. 15 B 23651. He eventually converted his proceeding to a Chapter 7 proceeding and a discharge order was entered by this court on January 7, 2016 – except as to the adversary proceeding that Golden filed in case 16 A 14.

3. On July 16, 2015, an order was entered, drafted by Gibrick's attorney, stating in pertinent part that Gibrick filed for bankruptcy and claimed his wildcard exemption. (See Order dated July 16, 2015 attached hereto as **Exhibit B**.)

4. On February 16, 2018, this Honorable Court entered a default judgment against Gibrick as a sanction for his behavior during the adversary proceeding and ultimately declared

4

the debt to Golden was non-dischargeable. (See Order dated February 16, 2018 attached hereto as **Exhibit C**.) ("Given the seriousness of Gibrick's misconduct . . . the sanction of a default judgment is entirely warranted.") *Id*.

5. On November 16, 2018, a Citation to Discover Assets was issued to Gibrick to continue collection after entry of this Court's default judgment. (See Citation to Discover Assets attached hereto as **Exhibit D**.)

6. The Citation caused the Defendant's judgment/balance due on the judgment to become a lien, which binds nonexempt personal property, including money, choses in action, and effects of the judgment debtor as follows: (1) When the citation is directed against the judgment debtor, upon all personal property belonging to the judgment debtor in the possession or control of the judgment debtor or which may thereafter be acquired or come due to the judgment debtor to the time of the disposition of the citation. 735 ILCS 5/2-1402(m)(1).

7. The Citation also prohibited the Defendant "from making or allowing any transfer or other disposition of, or interfering with, any property not exempt from execution or garnishment belonging to the judgment debtor or to which the judgment debtor may be entitled or which may be acquired by or become due to the judgment debtor and from paying over or otherwise disposing of any money not so exempt, which is due or becomes due to the judgment debtor, until further order of court or termination of the proceedings."

8. On February 13, 2019, after nearly three months of non-compliance with the Citation, Golden presented his first Petition for Rule to Show Cause as to why Gibrick should not be held in indirect civil contempt of court for failure to produce documents required. (See Petition dated February 13, 2019 attached hereto as **Exhibit E**.)

9. On March 8, 2019, Wells Fargo filed a foreclosure case against Gibrick in the Circuit Court of Lake County, Case No. 19 CH 322. Golden was named as a Defendant "by virtue of a Memorandum of Judgment against Lanny Gibrick in the amount of $16,374.23, plus interest and costs, recorded March 11, 2015 as Document Number 7176767, Lake County, Illinois records." Neither Golden nor his counsel was served with notice of the pending case.

10. On April 2, 2019, a Rule to Show Cause why Gibrick should not be held in Civil Contempt of Court was issued against Gibrick. (See Order dated April 2, 2019 attached hereto as **Exhibit F**.)

11. On or about May 9, 2019, over 5 months after the Citation was issued, Gibrick finally turned over the required documents, which showed in part that he reported gross income of $69,189 in 2018, $81,918 in 2017, $57,218 in 2016 (without including his wife's earnings).

12. Meanwhile, Gibrick worked as an independent contractor for two different companies since 2015. Both companies were under citations issued to them in June 2019 that prohibited payment to Gibrick, and all monies they subsequently paid to Gibrick should have been paid to Golden. Nonetheless, the companies violated their citations by consistently paying Gibrick in full for work done. Additionally, Gibrick violated his 2018 Citation by having one of the companies directly deposit monies into his account or depositing checks into an account he shared with his son or into an account(s) held solely by Gibrick's son.

13. On November 5, 2019, a second and more serious Rule to Show Cause against Gibrick was issued and scheduled for hearing on December 18, 2019 at 1:30 p.m. (See Petition for Rule to Show Cause dated November 4, 2019 and Order dated November 5, 2019 attached hereto as **Exhibit G**.)

14. On November 5, 2019, unbeknownst to Golden or his counsel, Gibrick sold his house in violation of the 2018 Citation, which subsequently caused the foreclosure case to be dismissed against him. (See Warranty Deed dated November 5, 2019 attached hereto as **Exhibit H**.)

15. Upon information and belief, between February 2019 and December 15, 2019, Gibrick purchased a car in violation of the 2018 Citation, which he failed to disclose to Golden during any of the proceedings to discover his assets.

16. On December 16, 2019, two days before the scheduled contempt hearing, and less than four years after his Chapter 7 general discharge, Gibrick filed a petition for Chapter 13 bankruptcy protection ("Petition"), which automatically stayed all proceedings against him including collection of Golden's Judgment, despite it being non-dischargeable.

17. Gibrick's Petition, however, appears to contain misrepresentations or false statements made in bad faith in spite of his attestations under the penalty of perjury.

18. Since the entry of Golden's Judgment five years ago, Gibrick has made only one quasi-voluntary payment of *$25.00* despite earning significant income.

## Cause/Bad Faith

Since no single factor is determinative of bad faith, numerous factors are applicable in this case and easily conform to the totality of the circumstances review.

### I. Timing of the Petition

The timing of Gibrick's Petition was merely two days prior to the state court holding a hearing to decide whether he should be held in indirect civil contempt of court for his repeated and flagrant violations of the Citation to Discover Assets, which is treated as the court's order. In all, Gibrick violated his Citation's transfer prohibitions numerous times until the date he filed his

Chapter 13 petition, totaling at least $20,631. Gibrick failed to file any responsive pleading to the allegations against him in the Petition for Rule to Show Cause. Thus, it was very likely that he would have been remanded to jail for his repeated violations of court orders. In fact, Gibrick's previous Chapter 13 petition (that was eventually converted to Chapter 7) was filed on July 10, 2015, only six (6) days prior to a similar Petition for Rule to Show Cause and for Post-Judgment Attorney's Fees. (See Petition for Rule to Show Cause and Petition for Attorney's Fees filed July 1, 2015 attached hereto as **Exhibit I**.)

    **II.    Nature of the Debt and how the Debt Arose.**

The nature of the debt and how it arose is based on a default judgment entered against Gibrick on multiple counts including the Illinois Home Repair Fraud Act, the Illinois Consumer Fraud and Deceptive Business Practices Act, and common law fraud. All of the claims allow for recovery of attorneys' fees and costs, including for the collection proceedings that will be sought.

    **III.    Ability to Discharge Debt in a Chapter 7 Proceeding**

During an adversary proceeding in Gibrick's previous Chapter 7 matter, the Judgment became nondischargeable as a sanction due to his own actions. Without the sanctionable conduct, the Judgment likely would have been found to be nondischargeable on its own merits.

    **IV.    Motive for Filing the Petition**

Gibrick's motives for filing his Petition are two-fold: 1) to stay out of jail and 2) to avoid or drag out payment to Golden as long as possible. As stated above, each bankruptcy petition Gibrick filed has come right at the precipice of a hearing for sanctions, which included the possibility of being remanded into custody. In addition, Gibrick claiming that he pays all the liabilities while simultaneously excluding his wife from bankruptcy protections makes it is clear that his secondary motive is the purposeful evasion of paying Golden, since the Judgment was

8

never against his wife. Gibrick's reliance on the bankruptcy protections to keep him out of jail, however, must come to end.

Conversely, Gibrick's debts after the short sale of his home (aside from Golden's Judgment) were only one car payment, two small student loans that were about to be paid off, and an apparent smattering of small credit card balances that he did not include on the Profit and Loss Statement even though the accounts were opened prior to the Citation (see below). Yet Gibrick purposefully incurred additional debt with a new credit card and the purchase of the Subaru, and, somehow, an auto dealership approved him for credit on that purchase.[1] Even with the addition of the car payment and gas in the last few months, the debts are still modest in relation to Gibrick's income and his wife's income, especially once his Schedule J is adjusted to reflect the accurate amount of expenses (see below).

### V.     How the Debtor's Actions Affected Creditors.

Gibrick's actions have affected Golden detrimentally. He continues to incur thousands of dollars in attorney's fees and costs on collection efforts simply because he picked the wrong window blinds installer. Gibrick's evasion tactics have also caused Golden to lose faith in the legal system because justice delayed is justice denied. How much more should Golden have to endure only to have Gibrick hide behind bankruptcy protection and extend the process further? Meanwhile, on information and belief, Gibrick is receiving legal representation *gratis*.

### VI.    Debtor's Treatment of Creditor Before Filing His Petition.

Gibrick's treatment of creditors before the filing of his Petition has been with disrespect and indifference. Just recently he completed a short sale on his home that was in foreclosure and also purchased a vehicle, with both actions being violations of his Citation's prohibitions. The short sale meant that he would not have to pay the balance he owed to the mortgage company,

---

[1] Upon information and belief, Gibrick's brother Marc works for a car dealership.

who will take a loss on the loan it made to Gibrick. The recent purchase of the vehicle means that Chapter 13 protection will also allow him to make lower payments on the Judgment since they are not part of the reorganization plan.

As to Golden's Judgment, Gibrick has not shown any remorse for his failure to pay. Shortly after the Judgment was entered in December 2014, Gibrick indicated that he was willing to enter into an agreement to make monthly payments, but he failed to do so. (See Correspondence and proposed agreement attached hereto as **Exhibit J**.) He then tried to have the entire Judgment discharged in Chapter 7 proceedings, but was ultimately sanctioned by this Honorable Court and the debt became nondischargeable, which Gibrick did not appeal. During his May 30, 2019 continued Citation examination, Gibrick defiantly asked "what if I don't work?" On his September 5, 2019 continued Citation examination, he stated that he "doesn't care" what happens to him. His only quasi-voluntary payment did not use his own income, but consisted of endorsing over a $25.00 check to Golden's counsel that he received to be a witness in the state court case against his own brother, which was instituted and paid for by Golden.[2]

Gibrick's goal, evidently, is a deliberate and persistent plan of evading a major creditor or delay payment for as long as possible. Golden is now Gibrick's single largest creditor with a current balance of over $20,000 that continues to accrue interest at 9% per annum, which is more than 50% of the debt to be reorganized. An additional goal of Gibrick's appears to be having this Court figure out the lowest possible monthly payment that can be made to Golden, which is evidenced by the failure to keep any expenses in his wife's name, the recent addition of the Subaru, and opening what appears to be a Barclay's Bank credit card in June 2019 which is *already* in collections. In fact, there is no substantial reorganization because Gibrick never paid

---

[2] The matter against Marc Gibrick is a state court fraudulent transfer claim between the two brothers relating to Golden's Judgment. Marc Gibrick then filed for Chapter 7 bankruptcy days before his trial was to occur, and an adversary proceeding is currently pending in that matter (Case No. 19-15177/Adv. Pro. No. 19 AP 926).

the Judgment regularly in the first place. Now, Gibrick has voluntarily incurred nearly $7,500 in fees to his bankruptcy attorney and the trustee while paying an additional car loan directly to the financing company.

Gibrick also attempted to outsmart his creditors by depositing his income into an account held solely in his son's name. Gibrick's network of employers, for whom he has worked for many years, have also violated the third-party citations issued to them by Golden that prohibited paying Gibrick for work performed. (See Petitions for Rule to Show Cause against Offsprings2, Inc. d/b/a Vertical Blinds Factory and Roberts Drapery Center, Inc. attached hereto as **Exhibit K**.) Initially, in response to the third-party citations, both employers claimed that Gibrick only worked part-time or on an as needed basis or even that they don't use him anymore due to these the collection proceedings. Nevertheless, they paid him on nearly a weekly or bi-weekly basis since June 26, 2019 in an amount of at least $20,631.00.

### VII.     Debtor's Treatment of Creditor After Filing His Petition.

Gibrick's treatment of creditors after filing his Petition remains to be seen as it has only been two weeks. Gibrick apparently intends to make monthly payments on the Judgment over five years, not counting the simultaneously accruing interest, attorney's fees, and costs which have not been calculated yet. In fact, Gibrick is willing to pay unnecessary trustee's fees and attorney's fees totaling nearly $7,500.00, or 18.5% of his outstanding debt, simply to delay paying Gibrick for as long as he can and to avoid being held in contempt and going to jail. This is clearly a ruse because if Gibrick actually attempted to make any payments previously, then the amount he paid would have been significantly less at a time when he was earning more income.

### VIII.    Whether the Debtor has been Forthcoming with the Bankruptcy Court and the Creditors.

Gibrick has not been forthcoming with the bankruptcy court and the creditors. Without including his wife's income, Gibrick's tax returns provided during the state court proceedings showed that he earned gross income of $57,218 in 2016, $81,918 in 2017, and $69,189 in 2018. Conversely, Gibrick stopped making his mortgage payments of $3,398.36 around 2017 or 2018, which meant that he was actually padding his own pockets every month. When asked where all of the money went that he earned or saved, Gibrick responded that he'd like to know, too.

In addition, Gibrick's Income and Asset Form completed in response to the Circuit Court's Citation claimed that he possessed only one vehicle, a 2010 Chevrolet Suburban. (See Income and Asset Form dated February 28, 2019 attached hereto as **Exhibit L**.) On May 30, 2019, during his Citation examination under oath, Gibrick doubled down that he possessed only that one vehicle. Yet his Chapter 13 Petition suddenly lists a 2013 Subaru XV Crosstrek in which he has sole interest. (Schedule A/B, Part 2, ¶ 3.2.) The exact date that Gibrick acquired the vehicle is unknown because he failed to state when the asset and corresponding debt was incurred. (Schedule D, Part 1, ¶ 2.2.) Either he attempted to shield the asset from the Citation proceedings or, more likely, he acquired the Subaru in violation of the Citation prohibitions.

Meanwhile, Gibrick still has sufficient resources to pay his debts. As stated above, his income has been significant over the past few years. Yet in the Income and Assets Form from the Citation proceeding, Gibrick did not immediately disclose how much he was earning, stating only that it "varies." (Ex. L.) On or about April 16, 2019, Gibrick finally provided a profit and loss statement after the state court issued a Rule to Show Cause. (See Profit and Loss Statement attached hereto as **Exhibit M**.) Gibrick stated that his earned "Revenue" was $10,408.00 from January 1, 2019 to March 31, 2019, or about $3,469.33 per month. In his Chapter 13 Petition, however, Gibrick now states that he is earning $5,742.00 per month, which would be the

12

equivalent of $68,904 per year and a 65% increase from first three months of the year. (Schedule I, Part 2, ¶ 10.) That amount is separate from the $3,826/mo. net income that his wife is alleged to earn. (*Id.*) Gibrick also states that his income from January 1 to December 31, 2018 was $6,564 (Form 107, Part 2, ¶ 4), yet line 1 of his 2018 federal tax return shows Wages, Salaries, Tips, etc. to be $65,644. Regardless of whether a clerical error may have been made, Gibrick's Schedule C tax form from 2018 shows gross receipts or sales in the amount of $69,189, gross income as $56,585, and expenses in the amount of $60,925! Those expenses include, but are not limited to, depreciation of $19,878 for auto and truck expenses, $6,473 for advertising, $14,647 for depreciation, $1,743 for construction software, and $1,151 for a marketing database. When asked about those expenses during his Citation examination on May 30, 2019, Gibrick stated that: 1) he does not prepare his own taxes; rather, "Charlie" at his wife's office prepares their returns [despite the 1040s showing they are self-prepared]; 2) he does not know what vehicle expenses were used; 3) he did not know that he drove over 40,000 miles in one year for business or other purposes (not including personal use); 4) he does not know what the depreciation amount encompassed; 5) he does not know what the advertising was for since he did not personally place any ads; 6) he did not know why he had $1,700 in construction software costs and advised instead that Golden's counsel ask his accountant; and 7) he did not have a marketing database [especially since as a contractor he does blinds installation work for clients of his employer]. In fact, Gibrick stated that he simply signs the returns and his accountant files them.

Gibrick likewise states in his Petition that his income from January 1 to December 31, 2017 was $90,608. (Form 107, Part 2, ¶ 4.) Although that amount matches the "Total Income" on line 22 of his 2017 Form 1040 (including his wife), his 2017 Schedule C shows that he earned gross receipts or sales of $81,918 and his gross income was $68,787, but he claimed expenses of

13

$61,117! One of the expenses claimed on the Schedule C was auto and truck depreciation in the amount of $27,663. When asked about that expense during his Citation examination on May 30, 2019, Gibrick again stated that he had no idea. For 2017 and 2018, then, Gibrick wrote off over $47,000 in auto depreciation for an eight year-old vehicle that had a base MSRP starting in the low $40,000-range in 2009-2010.[3] In addition to $12,801 in unknown advertising expenses and $5,973 in depreciation (despite not working in an office), Gibrick's 2017 Schedule C also claimed that he drove his vehicle for business and other purposes in excess of 57,000 miles. This means over the course of two years, Gibrick told the Internal Revenue Service he drove over 90,000 miles solely to install window blinds while only working part-time. That is the equivalent of driving *two roundtrips* between one of his employer's stores in Niles, IL to Kenosha, WI (est. 120 miles) every single day of the year, including weekends and holidays. Yet Gibrick could not put in the effort to make more than one payment toward his judgment over the course of five years.

It appears, additionally, that Gibrick is inflating his expenses to hide his financial well-being, including putting all expenses in his own name. For example, Gibrick lists health insurance in his Petition at a cost of $591/month (Schedule J, Part 2, ¶15b), yet his 2019 Profit and Loss Statement tendered during the state court proceedings stated his health insurance was only $315.17 per month – an increase of $275/month. (Ex. M.) Monthly premiums for individuals and/or families do not normally vary during the year without an approved life event. Gibrick also lists payments for college tuition as being $1,300/month (Schedule J, Part 2, ¶17d), but fails to state when the debts were incurred, which total $1,504 owed to DePaul and $113 owed to Empire Beauty School. (Schedule E/F, Part 2, ¶¶4.3-4.4.) Aside from not being enrolled in college or beauty school, Gibrick's payments did not previously appear in his Profit and Loss

---

[3] According to Kelley Blue Book (https://www.kbb.com/chevrolet/suburban-1500/2010/).

Statement. In fact, he disclosed that he *was not* contributing to college for his son or daughter during the May 30, 2019 Citation examination. Clearly, the monthly payment is significantly inflated by approximately $1,100/mo. In the alternative, if the payment amount is not inflated, then the loans will be paid off in just over one month and will free Gibrick from those expenses.

19. Gibrick further lists his rental or home ownership expenses as $2,700/mo. and property/homeowner's/renter's insurance as $41/mo. (Schedule J, Part 2, ¶ 4). Conversely, he confirms in his Petition that he is not currently renting and has no interest in any insurance policies. (Form 101, Part 1, ¶ 11; Schedule A/B, Part 4, ¶ 31). Gibrick also states that he has an Executory Contract or Unexpired Lease with Sherri Crymble, but he fails to state the nature of the contract or lease. (Schedule G, ¶¶ 1-2.1.) He also lists his current address as 2149 Shadow Creek Court, Vernon Hills, IL 60061, which upon information and belief was purchased by Sherri Crymble. (See Warranty Deed dated August 19, 2019 attached hereto as **Exhibit N**.) This allowed the Gibricks to immediately move into the property during the foreclosure proceedings on their home. Meanwhile, upon information and belief, Crymble and Mrs. Gibrick are coworkers at International Services, Inc. ("ISI"), which provides *accounting* services. Additionally, upon information and belief, Crymble was represented in the home purchase by ISI's Corporate Counsel, Ryan Johnson. Further, Johnson is the attorney representing Gibrick in the Citation proceeding since November 2018. Upon information and belief, that representation is without charge. Moreover, Gibrick's son is a college student, but he has worked at ISI part-time while his pay is based on working forty hours per week. Thus, there appears to be suspicious activity surrounding the Gibricks' current living situation and income/expenses.

Gibrick also lists in his Petition that he has car payments of $372/month for the 2019 Chevy Suburban, $269/month for the 2013 Subaru, and transportation expenses (gas) of $890.00

per month. (Schedule J, Part 2, ¶ 12 & ¶¶17c-d.) In his Profit and Loss Statement from April 2019, however, the only listed vehicle is the Suburban at $372/month and auto gasoline as being $432/month. (Ex. M.) Thus, it has become evident that Gibrick recently purchased the Subaru – in violation of the Citation prohibitions. When the sudden increase of $727/mo. in car payments and fuel expenses are combined with increases of $275/mo. for health insurance and $1,100/mo. for student loan payments, Gibrick has inflated his expenses by $2,100/month, money which should be going to Golden to satisfy the Judgment.

Last, but not least, Gibrick closed his joint account with his wife immediately after a turnover order was secured on November 15, 2018 in the amount of $3,496.41, by showing Gibrick was using the account to deposit his earnings. Then, on August 1, 2019 and September 5, 2019, Gibrick admitted that he received electronic deposits, or deposited checks from his two contract employers, in a joint account with his son. Conversely, his Income and Assets Form stated that he did not have any bank accounts with his name on it, a clear attempt to hinder Golden's collection efforts. (Ex. L.) Gibrick stated he would withdraw his monies promptly and was in effect "cashing his checks." After Golden's counsel learned the truth through Chase Bank's responses to subpoenas, Gibrick simply began depositing into and withdrawing from a bank account held solely in his son's name using a duplicate ATM card.

## Conclusion

Why would Gibrick file for Chapter 13 bankruptcy and inflate his expenses after most of his debts were discharged in bankruptcy less than four years ago? In the last few months, his house was sold in a short sale to avoid foreclosure, but his new rent combined with his new Subaru costs (including gas) actually exceeds the prior mortgage payments he failed to make ($3,398.36 vs. $3,427.00). It is apparent that Gibrick's bad faith reason for filing his Petition is to

16

prevent being held in indirect civil contempt of court and going to jail. Thus, if this Honorable Court previously held that Golden's Judgment was not dischargeable and Gibrick only made one half-hearted payment since that time, then Gibrick should not be given any benefit of the doubt that his current Petition is not brought in bad faith.

The nature of Gibrick's debts, how they arose, the nondischargability of Golden's Judgment, the timing of Gibrick's petition and his motive, how his actions affected creditors, his treatment of creditors both before and after his petition was filed, and his lack of candor with this Court, the state court, and creditors clearly show a pattern of conduct involving dishonesty, scheming, avoidance, and self-preservation. Gibrick has failed to act in a manner consistent with someone who truly requires Chapter 13 protection. Based on all of the factors and facts above, the Automatic Stay should be lifted at least as to Golden as a creditor, or in the alternative, the entire Chapter 13 proceeding should be dismissed.

WHEREFORE, Creditor ROBERT GOLDEN moves this Honorable Court to either lift the Automatic Stay for cause as it applies to Robert Golden's continuing collection of his non-dischargeable judgment, and subsequently, or in the alternative, dismiss Debtor Lanny Gibrick's Chapter 13 Petition for cause, and for such further relief as this Court deems just and necessary.

**Dated:**    **December 30, 2019**        Respectfully submitted,

_____
The Law Offices of Brendan R. Appel, LLC
Attorneys for Creditor Robert Golden

The Law Offices of Brendan R. Appel, LLC
Brendan R. Appel (IL ARDC: 6271877)
Selwyn M. Skevin (Of Counsel) (IL ARDC: 6305289)
191 Waukegan Road, Suite 360
Northfield, Illinois 60062
(847) 730-4224
(847) 730-4114 (facsimile)