**United States Bankruptcy Court, Northern District of Illinois**

| Name of Assigned Judge | A. Benjamin Goldgar | **CASE NO.** | 19 B 35308 |
|---|---|---|---|
| **DATE** | | **ADVERSARY NO.** | |
| **CASE TITLE** | Lanny R. Gibrick | | |
| **TITLE OF ORDER** | Order granting motion to dismiss case | | |

**DOCKET ENTRY TEXT**

The motion of Robert Golden to dismiss the chapter 13 case of debtor Lanny R. Gibrick is granted. The case is dismissed.

**[For further details see text below.]**

**STATEMENT**

Before the court for ruling after an evidentiary hearing is the motion of creditor Robert Golden to dismiss the chapter 13 case of debtor Lanny R. Gibrick. These are the court's findings of fact and conclusions of law under Rule 52(a)(1) of the Federal Rules of Civil Procedure, Fed. R. Civ. P. 52(a)(1) (made applicable by Fed. R. Bankr. P. 7052, 9014(c)). For the reasons below, Golden's motion will be granted. The case will be dismissed.

**1. Facts**

The facts are drawn from the testimony at the hearing, the parties' exhibits admitted into evidence, and the docket in this bankruptcy case and related cases and proceedings.

**a. Gibrick's Relationship with Golden**

Gibrick ran a business called Alan's Draperies. Around 2014, Gibrick entered into an agreement with Robert Golden to furnish and install window treatments at Golden's residence. Golden put down a deposit, but Gibrick only installed a portion the window treatments. He never completed the job.

In 2014, Golden sued Gibrick for fraud in the state court. Gibrick must not have answered, because later in the year the state court entered a default judgment in Golden's favor, awarding him $16,374.23. Gibrick did not appeal the judgment.

## STATEMENT

### b. Golden Tries to Collect His Judgment

In March 2015, Golden's lawyer wrote Gibrick offering a settlement and enclosing a draft agreement. Under the agreement Gibrick would pay the entire judgment but could do so in 33 monthly installments of $500 and a 34th installment of $363.59. Gibrick never responded to the offer. He gave no credible reason for not doing so. First, he testified that he did not respond because Golden had insisted on a lump-sum payment. But the March 2015 letter and proposed agreement show otherwise. Later, he testified that he did not respond because he was not working and could not make the payments. When it was pointed out that he was working in 2016-18, Gibrick insisted his son's medical expenses prevented him from entering any kind of settlement. If so, though, he never wrote Golden's lawyer to explain.

With his settlement overtures unanswered, Golden began trying to collect his judgment. He recorded the judgment in Lake County because Gibrick owned a home in Buffalo Grove. He also had a citation to discover assets issued to Gibrick. The citation required Gibrick to produce documents at the examination. Gibrick appeared for examination but produced no documents. The state court continued the citation to July 2015 and ordered Gibrick to produce the documents.

In June 2015, Golden also had a subpoena issued to Chase Bank seeking statements for all accounts that Gibrick or his wife held there. Chase produced bank statements on three accounts bearing Gibrick's name. Because Gibrick had testified at the citation examination that he had a single bank account at Bank of America, and because Gibrick had transferred funds at least three times after he was served with a citation, Golden petitioned the state court to have Gibrick held in contempt.

### c. Gibrick Files His First Bankruptcy Case

In July 2015, Gibrick filed a chapter 13 bankruptcy case, halting the contempt proceeding and the rest of Golden's collection efforts. Gibrick soon converted the case to chapter 7, and Golden filed an adversary proceeding alleging that Gibrick's debt to him was nondischargeable under section 523(a)(2)(A) of the Code. After Gibrick answered Golden's complaint, Golden began taking discovery. Gibrick's discovery responses violated the rules, eliciting a motion to compel and for sanctions. The request to compel discovery responses was granted; the request for sanctions was continued.

Gibrick eventually provided responses that appeared to comply with the rules. But in the meantime Golden had taken his deposition, and Gibrick's deposition testimony revealed he had lied when he swore in his response to Golden's document request that the response was "based on a diligent and reasonable effort . . . to obtain information currently available." (Gibrick had stored Alan Draperies documents in his garage and had not bothered to go through them.) In

## STATEMENT

February 2018, Golden's sanctions request was granted; Gibrick's answer was stricken and a default judgment entered in Golden's favor. Gibrick's debt to Golden was excepted from discharge. Gibrick did not appeal the judgment.

### d. Golden Resumes Collection Efforts

With the debt held nondischargeable, Golden resumed his collection efforts. In November 2018, he served Gibrick with another citation to discover assets. This citation, too, included a list of documents for Gibrick to produce. Gibrick appeared in response to the citation but once more produced no documents. The state court continued the hearing and ordered Gibrick to produce the documents before the continued date. When Gibrick again produced nothing, in February 2019 Golden petitioned to have Gibrick held in contempt.

In November 2018, Golden also served a citation on Chase Bank covering all of Gibrick's accounts. The citation turned up a joint account with Gibrick's wife, and the state court ordered Chase to turn over $3,496.41. After Chase turned over the money, Gibrick and his wife closed their account and did not open another. The citation to Chase also turned up a joint account with Gibrick's son. More on that account and Gibrick's use of it below.

In April 2019, Golden presented his contempt petition in the state court. The state court granted the petition and issued a rule to show cause against. In Late May, Gibrick appeared, produced documents, and was examined.

Among the documents Gibrick produced were his tax returns from 2016, 2017, and 2018. The tax returns show that in each year, Gibrick and his wife had income well over $100,000, and their income for the three-year period totaled more than $410,000. In those three years, Gibrick paid Golden nothing.

In June 2019, Golden had citations to discover assets issued to Roberts Drapery Center, one of Gibrick's employers, and to Offsprings2, Inc., another employer. Both employers produced copies of checks they had issued to Gibrick. The checks showed that between January and June 2019 Roberts had paid Gibrick $5,760, and between November and June 2019 Offsprings2 had paid Gibrick $20,066. Gibrick paid nothing to Golden from the monies he had received.

In July 2019, Chase produced documents from Gibrick's joint account with his son. The documents showed that from December 2018 through March 2019, Offsprings (an entity related to Offsprings2) had paid Gibrick $1,955. The payments had been made to the joint Chase account; Gibrick then transferred them out. With the transfers revealed, Gibrick closed the joint Chase account with his son. He currently has no bank accounts in his name. His wife, though, still maintains a bank account.

In November 2019, Golden petitioned yet again to have Gibrick held in contempt. The

-3-

**STATEMENT**

continued citations and the petition came before the state court on November 5, and the court set a hearing for December 18.

The day after Golden presented his latest contempt petition, Gibrick and his wife sold their home in Buffalo Grove. Earlier in the year, the Gibricks had stopped paying their mortgage, and Wells Fargo, which held the mortgage, sued to foreclose. The November sale was a short sale; nothing from the sale went to Golden.

With their house sold, the Gibricks needed a place to live. They rented a house from a co-worker of Mrs. Gibrick. The Gibricks paid the co-worker $2,700 in cash as a security deposit. The monthly rental is $2,700. The Gibricks pay the rent in cash.

In December 2019, Golden petitioned to have Roberts and Offsprings2 held in contempt. Golden said in the petition that in violation of the citations Golden had served earlier in the year, the employers had continued to pay Gibrick. To resolve the petition, Roberts and Offsprings2 paid Golden a total of $13,000. That sum covered only some of Golden's attorney's fees.

Gibrick has not worked since November 2019 and cannot get work. Roberts and Offsprings2 were upset at Gibrick's having embroiled them in his legal problems – "very upset," Gibrick testified. As a result, neither has been willing to employ him. "They won't touch me," he said. Other potential employers have also refused to hire him, citing the litigation with Golden; they do not want to be "dragged into court." Gibrick's prospects of working again, at least as a window treatment installer, are uncertain. He offered no evidence that he was trying to get any other work.

### e. Gibrick Files His Second Bankruptcy Case

On December 16, 2019, two days before the December 18 hearing on Golden's contempt petition, Gibrick filed this chapter 13 case. Along with the petition, he filed a complete set of schedules, a Statement of Financial Affairs, and a proposed chapter 13 plan.

Gibrick's schedules in the chapter 13 case showed he owns two cars: a Chevrolet Suburban and a Subaru bought in 2013. His schedules reflect two secured debts, both for the cars.

The schedules reflect a single priority unsecured debt to the IRS: $6,155 for unpaid 2016 taxes. At the hearing, though, Gibrick suggested he does not owe the IRS debt. He said he intends to hire a "tax professional" and file an amended 2016 federal return, presumably one that will eliminate the debt.

The schedules also list eight general unsecured creditors, one of them Golden. The general unsecured debt totals $29,304. Of that amount, Golden is owed $19,985 or 68% of the total. Of the remaining seven, all are owed debts that Gibrick incurred after Golden obtained his

-4-

STATEMENT

default judgment in 2014.  Rather than pay Golden, in other words, Gibrick took on additional obligations.

Gibrick's Schedule I says he works as an installer for Roberts Drapery in Niles.  It also says he has a "part time job" with an unidentified employer.  His monthly income is said to be $5,742.  Schedule I shows his wife is employed as well.  Together, their monthly income on Schedule I is $9,568, or $114,816 a year.  Because their household income is above the median, Gibrick's projected disposable income is determined under section 1325(b)(3), and his applicable commitment period is 60 months.  11 U.S.C. § 1325(b)(3).

Gibrick has proposed a plan in which he would make 60 monthly payments of $825.  The plan provides for payments to the secured lenders on the Chevrolet and the Subaru.  It also provides for payments to Golden.  Although Gibrick listed Golden in the schedules as an unsecured creditor, the plan treats Golden's claim as secured (perhaps because his judgment is recorded) and lists Golden's claim as $19,985 with interest due at 9%.  Under the plan, Gibrick would pay Golden $414.86 each month for 60 months.  Golden would receive $24,891.34 and would be paid in full at the end of the plan term – in December 2025, if everything went without a hitch.

Gibrick's schedules and Statement of Financial Affairs contain several errors.

• The Subaru belongs to Gibrick's wife, not Gibrick, and Gibrick is not on the note.  So Gibrick should not have listed the Subaru on Schedule A/B, should not have listed Subaru Motors Finance as a creditor on Schedule D, and should not have claimed an exemption for the Subaru on his Schedule C.  Nor should he have provided for payments to Subaru Motors Finance in his plan.

• Because Gibrick was not working on the petition date, still is not working, and apparently has little prospect of working, Schedule I should not have listed his employer as Roberts Drapery and should not have included his part-time job.  Schedule I should have shown him as having no income.

• Because Gibrick has no income himself, Schedule I wrongly implies that Gibrick pays at least some of the household expenses  – including $890 for transportation, $356 for monthly phone, internet, and cable expense of $356, $786 for food and housekeeping supplies, and $1,300 for his son's college tuition.  In fact, Gibrick admitted, his wife pays these expenses.  He contributes when he can.  (Even before November 2019, Gibrick's wife paid the bills because she was the only one with a checking account.)

• The Statement of Financial Affairs mistakenly says the Gibricks lived at the Buffalo Grove address until August 2019 rather than November 2019, shows the sale of the Buffalo Grove as taking place in August rather than November, lists the buyer of the property as "bona fide purchaser" (not the buyer's name), and misstates Gibrick's 2018 income as $6,564.

-5-

## STATEMENT

Despite these errors, Gibrick signed and swore to the accuracy of the schedules and Statement of Financial Affairs.

On January 21, Gibrick filed (1) an amended Schedule A/B that dropped Subaru Motors Finance as a creditor (2) an amended Schedule C that eliminated the exemption claimed in the Subaru, and (3) an amended Statement of Financial Affairs that corrected his 2018 income. But Gibrick filed no amended Schedule D, and he corrected none of the other errors. Still, he signed and swore to the accuracy of the amended schedules and Statement of Financial Affairs, as he had done with the first versions.

Gibrick's meeting of creditors under section 341 was scheduled for January 14. Gibrick failed to appear for the meeting.

Gibrick made his first plan payment of $825 but testified that he had to borrow the money to make it. He said he had borrowed money three or four times since he filed his petition. Gibrick admitted he had not sought or received permission from the bankruptcy court to take on more debt.

Two weeks after Gibrick filed his chapter 13 case, Golden moved to dismiss the case because it was filed in bad faith. Gibrick opposed the motion, and the court held a hearing at which Gibrick was the sole witness.

### 2. Discussion

Golden's motion will be granted. The evidence showed that Gibrick filed this case only after cheating Golden, paying him nothing even when he could, and dodging Golden's collection efforts. The chapter 13 case is Gibrick's latest dodge. He filed the case with Golden in mind, and although Golden has been chasing Gibrick for more than five years, the proposed plan would stretch out payments to Golden for another five – if, that is, the case makes it out of the gate. The evidence also showed the case has been doomed from the start, suggesting that Gibrick's only purpose in filing it was to get the benefit of the automatic stay. His bad faith is readily apparent. The case will be dismissed.

### a. Good Faith

The Bankruptcy Code imposes no explicit good-faith requirement for filing a chapter 13 petition. But section 1307(c) says a chapter 13 case can be dismissed for "cause," and the court of appeals has held that "cause" includes a lack of good faith. *See In re Love*, 957 F.2d 1350, 1354 (7th Cir. 1992).

Because good faith lacks a precise definition, the good-faith inquiry is "a fact intensive determination . . . left to the discretion of the bankruptcy court." *Id.* at 1355. *Love* directs bankruptcy courts to "look at the totality of circumstances" and make the determination on "a

## STATEMENT

case-by-case basis." *Id.*

The focus of the inquiry, *Love* explained, is "whether the [bankruptcy] filing is fundamentally fair to creditors" and whether it is "fundamentally fair in a manner that complies with the spirit of the Bankruptcy Code's provisions. *Id.* The court in *Love* went on to provide a nonexhaustive list of factors relevant to the good-faith question:

> the nature of the debt, including the question of whether the debt would be nondischargeable in a Chapter 7 proceeding; the timing of the petition; how the debt arose; the debtor's motive in filing the petition; how the debtor's action affected creditors; the debtor's treatment of creditors both before and after the petition was filed; and whether the debtor has been forthcoming with the bankruptcy court and the creditors.

*Id.* at 1357; *see also In re Sidebottom*, 430 F.3d 893, 899 (7th Cir. 2005). Not all of these factors must be considered, and not all of them will be relevant in every case. *In re Garzon*, No. 18 B 26026, 2018 WL 6287986, at *6 (Bankr. N.D. Ill. Dec. 3, 2018). "The bankruptcy court is free to decide the factors to consider and the weight to give them on an individual case basis." *In re Babcock*, No. 99 C 5385, 1999 WL 1212556, at *3 (N.D. Ill. Dec. 15, 1999).

The burden of proving a lack of good faith rests with the party moving for dismissal. *Love*, 957 F.3d at 1355.

### b. Gibrick's Lack of Good Faith

Golden easily met that burden. As Golden's attorney remarked at the hearing, Gibrick's case "checks all the boxes." Gibrick filed the case for an improper purposes, and the case is fundamentally unfair to Golden, the major creditor here.

Gibrick's debt to Golden is not the usual contract debt but arises from Gibrick's fraud. Despite the serious allegations Golden made against him in the state court action, Gibrick could not be troubled to defend. Ever since the default judgment was entered against him more than five years ago, Gibrick has sought to keep Golden from collecting it. He has stalled Golden, has lied and even perjured himself when it suited him, and has actively evaded collection.

Much of Gibrick's stalling has consisted of ignoring Golden. When Golden first sued Gibrick, Gibrick paid no attention to the lawsuit, and a default judgment was entered. Golden offered a settlement – on terms more favorable to Gibrick than the chapter 13 plan he has proposed – but Gibrick ignored the settlement offer, too.

When Golden began trying to collect the judgment, Gibrick continued to stall. Gibrick appeared for his citation examination in early 2015 but failed to produce the documents he was

**STATEMENT**

required to produce.  He also lied at the examination about the bank accounts he and his wife held, failing to disclose three accounts at Chase Bank.

Faced with the prospect of contempt, Gibrick then filed a bankruptcy case.  But during Golden's adversary proceeding against him, Gibrick ignored Golden's discovery requests until Golden forced the issue.  In the discovery responses he was forced at last to provide, Gibrick lied under oath again, claiming he had diligently searched for documents when he had not.  As a sanction, the bankruptcy court entered a default judgment against him, and his debt to Golden was declared nondischargeable.

Post-bankruptcy, Golden continued his collection efforts, and Gibrick continued to stall.  Golden served Gibrick with another citation.  Gibrick appeared for examination twice but produced no documents either time, requiring Golden to go the contempt route again.  Only when Golden's contempt petition was granted – in April 2019, more than four years after the default judgment was entered in the fraud action – did Gibrick finally produce any documents.

Critically, those documents included Gibrick's joint tax returns from 2016-18.  The tax returns showed that Gibrick and his wife earned more than $100,000 in each year.  In other words, Gibrick could have easily paid his small debt to Golden.  He chose not to.

When Golden still would not let up, Gibrick began arranging his affairs to frustrate collection.  After Golden served Chase Bank with a citation and obtained turnover of nearly $3,500, Gibrick and his wife closed their joint account at Chase and did not open another.  Gibrick instead began using a joint Chase account he had opened with his son when the son was in high school.  When Chase produced documents to Golden from that account, Gibrick closed it, too.  Gibrick no longer has any bank accounts.  His wife, who still has a bank account, pays the household expenses, and Gibrick reimburses her in cash.

In November 2019, Gibrick and his wife sold their Buffalo Grove home.  The sale was a short sale – no reason given – and none of the proceeds went to Golden.  Because Gibrick was still subject to the November 2018 citation to discovery assets, the sale also violated the citation's transfer restrictions.  The Gibricks then rented a house from one of Mrs. Gibrick's co-workers.  They paid the $2,700 security deposit in cash, and they pay the $2,700 monthly rent in cash.

With contempt looming, Gibrick filed this chapter 13 case two days before the next scheduled hearing in the state court.  The case is all about Golden and represented just another stall on Gibrick's part.

• The case is all about Golden because Gibrick has almost no secured debt (just a single car loan); his priority unsecured debt is a debt to the IRS he believes he can amend his tax return to eliminate; and Golden holds almost 70% of the general unsecured debt.

-8-

## STATEMENT

• The case represents another stall for three reasons.  First, Gibrick will not receive a discharge in this case because he received a discharge in December 2016 in the chapter 7 case. *See* 11 U.S.C. 1328(f)(1).  Second, Gibrick is not eligible to be a debtor in a chapter 13 case because he is not working and has no regular income.  *See* 11 U.S.C. § 109(e).[1/]  Third, with no income available for plan payments, Gibrick cannot propose a feasible plan, *see* 11 U.S.C. § 1325(a)(6), and his plan cannot be confirmed.

Because his chapter case has no future and never did, Gibrick's sole purpose in filing it was to gain the benefit of the stay, postponing Golden's collection efforts yet again.  But obtaining the stay's protection "cannot be the only purpose of a bankruptcy case." *Garzon*, 2018 WL 6387986, at *5.  "When the sole object of a case 'is to delay (or defeat) a single judgment creditor, with no benefit to the creditor body as a whole, the case has been filed in bad faith.'" *Id.* (quoting *In re Liptak*, 304 B.R. 820, 836 (Bankr. N.D. Ill. 2004)).

Finally, Gibrick's conduct in the bankruptcy case, brief though that case has been, suggests Gibrick has been less than forthcoming with the court and with creditors.  The schedules, Statement of Financial Affairs, and plan have many errors, only some of which have been corrected.  Gibrick missed his creditors' meeting.  And Gibrick admitted having borrowed money several times post-petition without permission of the bankruptcy court, although permission was arguably necessary.  *See* Keith M. Lundin, *Lundin on Chapter 13* § 69.1, LundinOnChapter13.com (last visited Feb. 4, 2020).

In all, the evidence at the hearing painted an unattractive picture of someone who refuses to deal responsibly or honestly with others.  Gibrick has a long history – more than five years – of evading Golden, his major creditor.  Gibrick's chapter 13 case is only the latest episode.  That case is fundamentally unfair to creditors, Golden in particular, and violates the spirit of the Bankruptcy Code.

At the hearing, though, Gibrick claimed otherwise.  He testified that he has been trying since 2015 to get to what he called "a safe place," and he filed the chapter 13 case because he "wants this to end" – meaning, apparently, Golden's efforts to be paid.  He claimed he would pay his debt to Golden when "I get on my feet."  None of this was credible.  As his tax returns and bank statements showed, Gibrick was "on his feet" and able to pay Golden in 2016-18.  Gibrick never paid a dime.  When Gibrick said he wanted "this to end," what he really meant was that he wanted Golden to go away and leave him alone.

In fact, much of Gibrick's testimony at the hearing lacked credibility.  Gibrick had a

---

[1/]   Although an unemployed debtor can be eligible if his non-filing spouse has sufficiently stable and regular income she will contribute to the plan, *In re Sigfrid*, 161 B.R. 220, 222 (Bankr. D. Minn. 1993), no evidence showed Gibrick's wife can or will contribute:  Gibrick admitted he had borrowed money to make his first plan payment.

**STATEMENT**

selective memory, recalling obscure facts but claiming not to know such basics as what his wife did for a living and who prepared his tax returns. He even claimed not to have understood most of the legal proceedings against him, insisting (for example) that he did not comprehend the citations to discover assets served on him. But his claim did not ring true. And even if it were true and he had not comprehended, a responsible person hit with legal papers or summoned to court *consults a lawyer*. Gibrick said he never did, although he not only had a lawyer but one who was representing him for free. At best, then, Gibrick was willfully ignorant, believing he could stiff Golden and then blow off the consequences. At worst, he was an outright liar.

For his part, Gibrick's bankruptcy lawyer acknowledged his client's "bad history." Still, he maintained the chapter 13 case had been filed in good faith because Gibrick was not a "serial filer." But serial filing is not the *sine qua non* of bad faith. Just as serial filers do not necessarily act in bad faith, *see In re Snipes*, 314 B.R. 898, 901 (Bankr. S.D. Ga. 2004), a debtor who has filed only once before may well have done so, *see, e.g., In re Garzon*, 2018 WL 26026, at *3-4 (finding bad faith where the debtor's chapter 13 case was filed in bad faith although he had filed only one other case). Gibrick's "bad history" consists, not of serial filing, but of evading Golden's collection efforts, evasions that included perjury, and then using the bankruptcy system as yet another evasion.

Because the totality of the circumstances show that Gibrick's case is not a genuine effort to pay Golden but is another way of putting him off, the case was filed in bad faith and will be dismissed.

One last point. At end of the hearing, Golden asked for dismissal with a bar to refiling. The problem with that request is that Golden did not make it in his motion; he raised it for the first time in court. But Golden needs no bar to protect him from further abuse of the bankruptcy system. A bar lasts 180 days. *See* 11 U.S.C. § 109(g). If, after the dismissal of this case, Gibrick files a new case in the next year, the automatic stay will be in effect for only 30 days – unless Gibrick shows the new case was filed in good faith, *see* 11 U.S.C. § 362(c)(3), a showing he is unlikely to make. So the stay will disappear in a month. And with no stay in effect, a new bankruptcy case will not impede Golden's attempts to collect from Gibrick at last.

### 3. Conclusion

For these reasons, the motion of Robert Golden to dismiss the chapter 13 case of debtor Lanny R. Gibrick is granted. The case is dismissed.

Dated: February 6, 2020

_____
A. Benjamin Goldgar
United States Bankruptcy Judge

-10-